1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Lynda Tyler,                                No. 2:24-cv-01374-KJM-DMC

12                    Plaintiff,                 ORDER

13          v.

14   Tailored Shared Services, LLC,

15                    Defendant.

16

17          Defendant Tailored Shared Services, LLC moves to compel arbitration of claims by its

18   former employee, plaintiff Lynda Tyler.  Tyler argues she did not agree to arbitrate, and she

19   contends the arbitration agreement in question is unconscionable in any event.  As explained in

20   this order, Tyler did agree to arbitrate, but she has shown the agreement is unconscionable.  It was

21   essentially forced upon her, and it creates an unfairly one-sided system for resolving employment

22   disputes.  The court therefore **denies** the motion to compel arbitration.

23          In the alternative to an order compelling arbitration, the company requests a stay while

24   two other similar actions are pending in other California courts.  The company has not

25   demonstrated a stay is appropriate, so its request for a stay is **denied**, as explained below.

26   **I.      BACKGROUND**

27          Tailored Shared Services operates retail clothing stores under a variety of brands,

28   including Men's Wearhouse and Jos. A. Bank.  *See* Compl. ¶ 16, ECF No. 1.  Tyler worked at a

                                                1

1   store in Redding, California in 2023 and 2024.  *See id.* ¶ 17.  She alleges Tailored paid her less

2   than the minimum wage, did not pay full overtime wages, did not offer her proper meal or rest

3   breaks, did not reimburse her business expenses, and sent her faulty and late wage statements,

4   among other similar claims, all in violation of California law.  *See, e.g.*, *id*. ¶¶ 19–27, 43–122.

5   She seeks to represent a class of similarly situated employees.  *See id.* ¶¶ 37–42.  The company

6   argues Tyler agreed to arbitrate these claims and waived her right to file this lawsuit; she

7   disagrees.  *See generally* Mot., ECF No. 12; Mem., ECF No. 12-1; Opp'n, ECF No. 14.

8          The company relies on a declaration by its manager of HR operations to show Tyler

9   agreed to arbitrate.  *See* Rodrigues Decl. ¶ 1, ECF No. 2-2; *see also* Rodrigues Reply Decl., ECF

10  No. 19-2.  According to that declaration, when new employees start, they log into an online

11  system and complete three forms.  Rodrigues Decl. ¶¶ 5–7.  The first two forms are an agreement

12  to receive and sign paperwork electronically, *see id.* ¶ 10 & Ex. 1, and an acknowledgement the

13  employees have received the employee handbook, *see id.* ¶ 11 & Ex. 2.  The third form is the

14  disputed arbitration agreement.  *Id.* ¶ 13 & Ex. 3.  The company's records show Tyler signed each

15  of these three forms electronically on her first day by logging into the system with her password

16  and clicking a button.  *See id.* ¶¶ 10, 11, 13; *see also id.* Ex. 3; *see also* Rodrigues Reply Decl.

17  Ex. 1 (showing arbitration agreement as displayed on screen).

18         The arbitration agreement includes more than five pages of small, single-spaced text, in

19  total more than 3,400 words.  It begins with a summary of its basic purposes:

20              I recognize that disputes may arise between [the Company and its
21              affiliates, defined together as "the Company"] and me during or
22              following my employment with the Company. The Company has a
23              process for resolving legal disputes with employees pursuant to
24              which a neutral professional called an arbitrator (rather than a judge
25              or jury) hears evidence and argument from both sides to a dispute
26              and makes a final, binding decision. This Mutual Arbitration
27              Agreement (the "Agreement") describes that process. I understand
28              and agree that by entering into this Agreement, the Company and I
29              hereby waive the right to have Covered Claims (as defined below)
30              decided in a court of law before a judge or jury, to assert or
31              participate in a class, collective, or representative action lawsuit or

2

1
2
3

arbitration (either as a named-plaintiff, class member, or representative), and to assert or participate in any joint or consolidated lawsuit or joint or consolidated arbitration of any kind.

4 Rodrigues Decl. Ex. 3 at 11.[1]

5      The agreement defines "Covered Claims" as "all grievances, disputes, claims, or causes of

6 action, regardless of the date they accrued, that otherwise could be brought in a federal, state, or

7 local court or agency." *Id.*  As examples, the agreement identifies "claims for wages, bonuses

8 other compensation, or reimbursements of any kind" and "claims for violation of any federal,

9 state, local, or other governmental law, constitution, statute, regulation, wage order, or

10 ordinance." *Id.* at 11–12.  Covered claims also include disputes about interpreting and enforcing

11 the arbitration agreement itself.  *Id.* at 12.  But covered claims exclude "claims for unemployment

12 or workers' compensation benefits," and certain "whistleblower retaliation claims."  *Id.*

13 Employees also can "choose to bring individual claims of sexual harassment or sexual assault" in

14 court, *id.*, and either party can "elect to have claims brought by either party heard in a small

15 claims court in lieu of arbitration," *id.*  If a case involves both covered and excluded claims, then

16 the excluded claims must be bifurcated and stayed "for the duration of the arbitration

17 proceedings."  *Id.* at 13.

18      The arbitration agreement broadly bars class actions and representative actions.  It also

19 requires all arbitrations to "proceed on an individual basis."  *Id.* at 13.  Both sides "waive the right

20 to a jury trial, to assert or participate in a class, collective, or representative action lawsuit or

21 arbitration . . . , and to assert or participate in any joint or consolidated lawsuit or joint or

22 consolidated arbitration of any kind."  *Id.*  That said, the agreement does include a section titled

23 "Supplemental Rules for Multiple Case Filings."  *Id.* at 15.  And under that section, the company

24 can consent to multiple claims by multiple employees being "joined, consolidated, or heard

25 together," and any single employee's claims can be "temporarily stayed or phased to allow the

---

[1] To avoid confusion, the page numbers cited here and in the exhibits to the reply declaration are those applied by the CM/ECF system to the top right of each page.

1   [arbitrator] to establish efficient and fair adjudication procedures.  *Id.*  The American Arbitration

2   Association's "Supplementary Rules for Multiple Case Filings" govern the joint arbitration.  *Id.*

3   The agreement requires that all arbitrations begin with a mandatory, informal attempt to

4   settle.  The person who initiates the arbitration, the "claimant," must send a demand to the other

5   party, the "respondent," at least forty-five days before filing any claim.  *Id.* at 13.  A claimant

6   may simultaneously serve a demand and begin arbitration if necessary to avoid running afoul of a

7   statute of limitations, but if so, the arbitration is automatically stayed.  *See id.*  The respondent

8   then has thirty days to make a settlement offer in response to the claimant's demand.  *Id.*  If the

9   offer is not accepted within fifteen days, it is "considered withdrawn," and the arbitration begins.

10  *Id.*  At the end of the arbitration, if the award "is not more favorable than the unaccepted Offer,"

11  then the claimant must pay the respondent's "reasonable costs," as determined by the arbitrator.

12  *Id.*

13  The arbitration agreement permits discovery, within fairly narrow limits.  Each side may

14  take depositions and request and subpoena documents from the other side and from third parties,

15  but the agreement does not permit other types of written discovery, such as interrogatories or

16  requests for admission.  *See id.* at 14–15.  Depositions of fact witnesses also are limited to three

17  per side unless the arbitrator determines additional depositions are "necessary to a full and fair

18  exploration of the issues in dispute, consistent with the expedited nature of arbitration."  *Id.* at 15.

19  The arbitration is confidential.  Except for claims for sexual harassment, "there shall be no

20  disclosure of evidence, the award, or the arbitrator's decision beyond the arbitration proceeding."

21  *Id.*  In other words, the agreement presumptively forbids the disclosure of any information except

22  that arbitration occurred.

23  When the company presents its employees with this arbitration agreement, it offers them

24  three choices: "I AGREE," "I DO NOT AGREE AND DO NOT ACCEPT THIS

25  POSITION," and "Return to forms Menu."  Rodrigues Reply Decl. Ex. 1 at 7 (emphasis in

26  original).  That is, agreement is mandatory.  It is a condition of employment.

27  Tyler remembers her first day, and she remembers she was "required" to sign a "series" of

28  documents on a company computer.  Tyler Decl. ¶ 6, ECF No. 14-2.  She understood the

1  documents explained the company's policies and were "standard forms" for everyone. *Id.* ¶ 7.

2  She remembers one of them had something to do with arbitration, but she did not believe she

3  would give up any rights by signing it. *Id.*  And in any event, she did not feel as though she had

4  time to read and understand what she was signing. *Id.* ¶ 11.  No one gave her a printed copy of

5  the arbitration agreement, no one told her she could print documents or take them home, and no

6  one told her she could wait to start her job until she had taken the time to read and understand

7  what she was signing. *See id.* ¶¶ 9–11.  From her point of view, she would not have a job if she

8  did not click the boxes on the computer screen right then and there. *See id.* ¶¶ 6, 8.

9      As noted above, the company argues Tyler's claims in this case are all "covered claims"

10  that she must arbitrate on an individual basis under the terms of its arbitration agreement. *See*

11  Mem. at 6–16.  It moves to compel arbitration or, in the alternative, to stay this case given two

12  similar cases that were pending in other courts when the company filed its motion. *See id.* at 16–

13  18 (citing *Ramirez v. Tailored Shared Servs., LLC*, No. CIVSB2332636 (Cal. Super. Ct. San

14  Bernadino Cnty. filed Dec. 18, 2023), and *Marshall v. Tailored Shared Servs., LLC*, No. 24-3446

15  (C.D. Cal. removed Apr. 26, 2024)).[2]  Tyler opposes both requests, *see generally* Opp'n, ECF

16  No. 4, and the matter is now fully briefed, *see generally* Reply, ECF No. 9.  The court took the

17  matter under submission without holding a hearing.  Min. Order, ECF No. 22.

18      After briefing was complete, the parties filed two additional requests for judicial notice,

19  citing intervening orders in the *Ramirez* and *Marshall* actions.  First, the company filed a copy of

20  an order by the state court overseeing the *Ramirez* action; it had granted the company's motion to

21  compel arbitration of the claims in that case. *See generally* Tailored Req. J. Not., ECF No. 20.

22  Second, Tyler gave notice the federal district court overseeing the *Marshall* action had granted

23  the plaintiff's motion to remand that case to state court, and had accordingly denied a pending

24  motion to compel arbitration as moot. *See* Tyler Req. J. Not., ECF No. 25.  The court grants the

25  requests for notice of these filings as well. *See Rosales-Martinez*, 753 F.3d at 894.

---

[2] The court grants the parties' requests for judicial notice of the filings in these cases, but not of the truth of the claim or allegations within any of those filings. *See Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that we may take judicial notice of judicial proceedings in other courts.").

1    **II.    ARBITRATION**

2          In general, if an arbitration agreement encompasses the claims in a particular lawsuit, the

3    court must enforce that agreement and compel arbitration.  *See Lim v. TForce Logistics, LLC*,

4    8 F.4th 992, 999 (9th Cir. 2021).  But an otherwise valid arbitration agreement may "be

5    invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability."

6    *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023) (quoting *Lim*,  8 F.4th at 999).  If

7    one party disputes another's assertion that they agreed to arbitrate, the Federal Arbitration Act

8    requires the district court to "hear the parties" and determine whether "the making of the

9    arbitration agreement" is "in issue."  9 U.S.C. § 4.  That is, the court decides whether there is a

10   "genuine dispute of material fact" under the standard of Federal Rule of Civil Procedure 56, which

11   governs motions for summary judgment.  *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670

12   (9th Cir. 2021).  Under that rule, a dispute is "genuine" if "a reasonable jury could return a verdict

13   for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is

14   "material" if it "might affect the outcome of the suit under the governing law."  *Id.*  The party

15   opposing arbitration bears the burden of proving its defense that the agreement cannot be

16   enforced.  *Lim*, 8 F.4th at 999.

17         Tyler's opposition in this case rests on two arguments: (1) she did not actually agree to

18   arbitration and (2) even if she did, the agreement should not be enforced because it is

19   unconscionable.  In disputes about arbitration agreements, the court is generally the one to decide

20   whether there is a valid and enforceable agreement, but the parties to the arbitration agreement

21   can delegate these threshold "arbitrability" decisions to an arbitrator as well.  *See Bielski*, 87 F.4th

22   at 1009.  The delegation must be clear and unmistakable.  *See AT & T Techs., Inc. v. Commc'ns

23   Workers of Am.*, 475 U.S. 643, 649 (1986).

24         The arbitration agreement in this case clearly and unmistakably delegates the resolution of

25   these threshold disputes to the arbitrator.  *See* Rodrigues Decl. Ex. 3 at 12.  Tyler does not argue

26   otherwise.  *See* Opp'n at 16 & n.6.  She instead contests the validity and enforceability of the

27   delegation clause.  *See id.* at 16–17 & n.7.  As with the broader agreement to arbitrate, a

28   delegation clause is enforceable only if the parties agreed to it, and generally applicable contract

6

1  defenses can invalidate the delegation just as they can invalidate the broader agreement. *See*

2  *Bielski*, 787 F.4th at 1009. But to challenge a delegation clause, litigants cannot attack the

3  arbitration agreement as a whole. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72–73

4  (2010). They must "specifically reference the delegation provision and make arguments

5  challenging it." *Bielski*, 787 F.4th at 1011.

6      Tyler contends she never agreed to the delegation clause, *see* Opp'n at 5, but the

7  undisputed evidence shows she did so by entering her username and password and clicking a

8  button that said, "I AGREE," *see* Rodrigues Decl. ¶¶ 10–13 & Ex. 3; Rodrigues Reply Decl.

9  at 7. The company also points out without contradiction that electronic signatures are valid under

10 California law. *See* Mem. at 7–8 (citing Cal. Civ. Code § 1633.7).

11     Tyler argues similarly that the arbitration agreement does not in fact require arbitration—

12 let alone arbitration under the delegation clause—but rather describes the company's "process" or

13 "policy" for resolving disputes between itself and its employees. *See* Opp'n at 3, 5–7; Tyler Decl.

14 ¶ 7. There is no question, however, that Tylor agreed to "waive the right to have Covered Claims

15 . . . decided in a court of law before a judge or jury." Rodrigues Decl. Ex. 3 at 11. She also

16 agreed an arbitrator, not a judge or a court, would have "exclusive authority" to decide whether

17 the arbitration agreement is applicable and enforceable and whether any particular claim was a

18 "Covered Claim." *Id.* at 12. Finally, she agreed the company could ask a court to stay a lawsuit

19 and "to compel arbitration." *Id.* at 16. For these reasons, unless Tyler's agreement to delegate is

20 itself unconscionable, as she contends it is, *see* Opp'n at 16–17 & n.7, this court must grant the

21 motion to compel arbitration, *see Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015).

22     Under the generally applicable California law of contracts, an agreement is not

23 unconscionable just because it was a "bad bargain." *Sanchez v. Valencia Holding Co.*, 61 Cal.

24 4th 899, 911 (2015) (quoting *Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1145 (2013)).

25 Agreements are unconscionable when their terms "are unreasonably favorable to the more

26 powerful party." *Id.* (quoting *Sonic*, 57 Cal. 4th at 1145). There are both "procedural" and

27 "substantive" elements to unconscionability. *Id.* at 910 (quoting *Sonic*, 57 Cal. 4th at 1133). The

28 "procedural" element relates to the circumstances of the contract's negotiation and formation.

1 *See Bieslki*, 87 F.4th at 1013 (applying California law).  Was there any "real negotiation"?  *Id.*

2 (quoting *Grand Prospect Partners v. Ross Dress for Less, Inc.*, 232 Cal. App. 4th 1332, 1347

3 (2015)).  Or did the less powerful party have no "meaningful choice" but to accept?  *Id.* (quoting

4 *Grand Prospect*, 232 Cal. App. 4th at 1347–48).  The focus is on "oppression or surprise due to

5 unequal bargaining power."  *Sanchez*, 61 Cal. 4th at 911 (quoting *Sonic*, 57 Cal. 4th at 1133)).

6 The "substantive" element, by contrast, focuses on the contract's terms.  *Bielski*, 87 F.4th at 1014

7 (applying California law).  Are they "overly harsh or one-sided"?  *Sanchez*, 61 Cal. 4th at 911

8 (quoting *Sonic*, 57 Cal. 4th at 1133).

9  A court can decline to enforce a contract only if it is unconscionable in both the

10 procedural and substantive senses.  *Id.* at 910.  It is not necessary to show the contract is

11 unconscionable to an equal extent procedurally and substantively.  *See id.*  "[T]he more

12 substantively oppressive the contract term, the less evidence of procedural unconscionability is

13 required to come to the conclusion that the term is unconscionable, and vice versa."  *Id.* (quoting

14 *Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).

15  Tyler has offered evidence to show the delegation clause is procedurally unconscionable.

16 That clause was part of a standardized contract presented to her as a take-it-or-leave-it deal.  *See*

17 *Bielski*, 87 F.4th at 1014.  The company does not suggest she could have asked to opt out of the

18 arbitration agreement or negotiated its terms.  Her circumstances were also oppressive.  It was her

19 first day at a new job.  As a matter of practical reality, she had two choices: accept the agreement

20 or work someplace else.  The circumstances reasonably led her to believe she was expected to

21 accept the whole of the "policy" right then and there—all of its 3,400 legalistic terms, including

22 the delegation clause, which was neither highlighted nor otherwise emphasized, and which was

23 found at the end of a long paragraph of legal language defining "Covered Claims."  *See* Tyler

24 Decl. ¶¶ 6–12.  Under the circumstances, she did not have time to read and understand the

25 agreement.  *See id.*  Courts have found in similar circumstances that agreements are procedurally

26 unconscionable.  *See Lim*, 8 F.4th at 1001 (collecting authority).

27  The company argues Tyler's circumstances were not oppressive.  It suggests she could

28 have printed the arbitration agreement, taken it home, mulled it over and even consulted an

8

1  attorney, citing the Ninth Circuit's unpublished memorandum disposition in *Streedharan v.*

2  *Stanley Industrial & Automotive*.  *See* Reply at 6–7 (citing No. 22-55999, 2023 WL 9067587, at

3  *2 (9th Cir. Jan. 4, 2023) (unpublished)).  In *Streedharan*, an automotive tool distributor had

4  more than a month to review and negotiate the terms of the disputed franchise agreement with the

5  help of a lawyer.  *See* 2023 WL 9067587, at *2.  No evidence shows Tyler had a similar period of

6  weeks to think about her choice.  No evidence shows the company was open to negotiations.  The

7  Ninth Circuit's opinion in *Lim* offers a much more compelling analogy in these circumstances.  In

8  that case, a company presented its delivery driver with a preprinted, single-spaced, multi-page

9  "take-it-or-leave-it" contract "on the day it was to be executed," and hidden within that contract

10  was a delegation clause.  *See* 8 F.4th at 1000–01.  The court found the clause and the broader

11  agreement were unconscionable.  *See id.*

12       The company argues the circumstances were, at most, unconscionable on only a

13  "minimal" level.  Reply at 7.  It is true there have been more extreme cases.  *Cf., e.g.*, *Saravia v.*

14  *Dynamex, Inc.*, 310 F.R.D. 412, 420 (N.D. Cal. 2015) (contract in English presented to someone

15  with only "limited" English comprehension).  The court cannot agree, however, that this is a case

16  of only minimal or low-level unconscionability.  The delegation clause was hidden in several

17  pages of legalistic text in small print on a screen, and the arbitration agreement was presented to

18  Tyler in circumstances that suggested she should not review it carefully and, that even if she did,

19  she could not negotiate.  In short, the circumstances of this negotiation show the delegation clause

20  was procedurally unconscionable in at least a moderate level.

21       Turning next to substantive unconscionability, Tyler makes many of the same arguments

22  about the delegation clause as she does about the broader arbitration agreement.  The company

23  protests this dual-purpose strategy at the outset.  It contends she must target the delegation clause

24  specifically, as that is the only clause currently in dispute.  *See* Reply at 5.  The Circuit has

25  confirmed, however, that a party may "use the same arguments to challenge both the delegation

26  provision and arbitration agreement, so long as the party articulates why the argument invalidates

27  each specific provision," *Bieslki*, 87 F.4th at 1011, just as Tyler has done, *see* Opp'n at 16–17 &

28  nn.6–7.  Neither the company nor Tyler has offered any reason to conclude that arbitration about

1    unconscionability would be governed by narrower or different rules than those that would

2    otherwise apply to the broader arbitration.  The court has found none.  It is appropriate to consider

3    Tyler's broader arguments to the extent they apply to the delegation clause in particular.

4         The court finds Tyler has proven that four provisions in the arbitration agreement combine

5    to create an unconscionably unfair, one-sided system for resolving disputes about whether the

6    arbitration agreement was enforceable and thus substantively unconscionable to at least a

7    moderate degree.

8         First, because arbitration is confidential under the terms of the agreement, employees who

9    arbitrate their enforcement disputes cannot disclose or share any evidence they receive, discuss

10   the arbitrator's reasoning, share information about the company's arguments or legal positions, or

11   even tell one another about the outcome.  *See* Rodrigues Decl. Ex. 3 at 15.  The company, by

12   contrast, will be a party to every arbitration.  It can take what it learns from each case and use that

13   information to its advantage in every case that follows.  The Ninth Circuit has recognized this

14   "repeat player effect" can combine with other provisions to make facially neutral confidentiality

15   provisions unfairly one-sided in effect.  *See Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1078–

16   79 (9th Cir. 2007), *overruled in part on other grounds as explained in Ferguson v. Corinthian

17   Colleges, Inc.*, 733 F.3d 928, 937 (9th Cir. 2013).

18        Second, relatedly, the discovery limits compound the informational asymmetry created by

19   the confidentiality rules.  *See Ramirez v. Charter Commc'ns, Inc.*, 16 Cal. 5th 478, 505 (2024)

20   (identifying "the amount of discovery allowed, the degree to which that amount may differ from

21   the amount available in conventional litigation, any asymmetries between the parties with regard

22   to discovery, and the arbitrator's authority to order additional discovery" as relevant

23   considerations).  That is, employees are not only at a disadvantage because they are not repeat

24   players and cannot share information with one another; the discovery rules also limit employees'

25   options in their own cases, too.  The company, by contrast, can take what it learns from one

26   arbitration to the next without violating the confidentiality rules, and in any given case, it also is

27   likely to have the most relevant records and testimony at hand, without ever conducting

28   discovery.  In this matter, for example, the company has relied on its manager of HR operations

1   and its own internal records without seeking or obtaining discovery.  If Tyler suspects others

2   might have different information about the arbitration agreement or the company's related

3   policies, she could not use interrogatories as they are not permitted.  She could try to identify

4   potential deponents using document requests, but if the deponents she ultimately selects lack the

5   information she seeks, she would have sacrificed one of her few depositions in vain.  These

6   asymmetrical circumstances, the absence of written discovery options and the default deposition

7   limits all exacerbate the informational disparity between the company and its employees.

8          Third, as summarized above, the company has thirty days to make a settlement offer at the

9   beginning of every arbitration, including arbitrations involving questions of enforceability and

10  validity.  *See* Rodrigues Decl. Ex. 3 at 13.  If the final award is less favorable to the employee

11  than the initial offer, then the employee may be responsible for paying the company's legal

12  expenses.  *See id.*  As Tyler points out without contradiction, individual employees are more

13  likely than the company to face financial constraints.  *See* Opp'n at 13.  As a result, the thirty-day

14  waiting period can both delay the awards that might be due to financially vulnerable employee-

15  claimants and mean the company's legal bills could hang over the heads of those same vulnerable

16  claimants.

17         And again, this third provision combines with the previous two to further compound the

18  company's advantage: the company can put its better information to use when it calculates its

19  initial offer.  For example, if the company has resolved similar disputes on similar terms, it can

20  offer the same deal, or a worse bargain.  Employees, who have only their own limited experience

21  and limited information to draw upon, will naturally be able to appreciate the company's

22  advantage.  They may elect to accept the offer, fearing they have miscalculated or are relying on

23  inferior information, even if their case is different from the others that went before.  Or,

24  alternatively, employees and their counsel might miscalculate the risk of obtaining a lesser award

25  based on the same limited information.  This miscalculation would accrue to the company's

26  benefit: it could seek its fees at the end of the arbitration.

27         Fourth, the company has greater power to consolidate or join similar claims than its

28  employees.  If many employees in a similar situation are represented by the same or similar

11

1  counsel, and if they raise similar enforcement and arbitrability arguments at about the same time,

2  those employees' claims could be stayed or arbitrated in phases "to allow the [American

3  Arbitration Association] to establish efficient and fair adjudication procedures."  Rodrigues Decl.

4  Ex. 3 at 15.  Claims could even be consolidated or heard together if the company chooses to go

5  that route.  *See id.*  Employees, by contrast, cannot aggregate or consolidate their claims.  The

6  agreement thus allows the company to arbitrate enforcement and validity disputes collectively

7  when it chooses, without giving employees the same option.  This fourth provision also combines

8  with the others to the company's benefit.  When the company's informational advantage is least

9  likely to be superior—when many employees are together represented by the same or similar

10  attorneys at the same time—the company could consolidate, or it could seek to preserve its

11  advantage by arbitrating the claims piecemeal, in "phase[s]."  *Id.*

12          The company's primary responses to Tyler's claims of substantive unconscionability are

13  that the provisions in question are facially neutral, *see* Reply at 8, that her legal citations are

14  unpersuasive or too few in number, *id.* at 7–8, and that the confidentiality and discovery limits are

15  permissible, *see id.* at 8–9.  But it does not matter that the provisions are neutral at face value.  In

16  practice, they set up a one-sided system, as explained above.  Nor has the company drawn any

17  meaningful distinctions between this case and those cited in Tyler's opposition.  For example, the

18  company urges the court not to follow the Ninth Circuit's decision in *Davis* because unlike the

19  plaintiff in *Davis*, Tyler could disclose the existence of arbitration—even though she cannot

20  disclose the parties' arguments, their evidence, the arbitrator's reasoning, or the award.  *See id.* at

21  8 (citing 485 F.3d at 1078–79).  It is unclear what effect that distinction has, and the company

22  does not explain.  Finally, it could be that any one of the four provisions discussed above would

23  not suffice in isolation to show the delegation clause is substantively unconscionable.

24  Confidentiality provisions, for example, are not always unfair.  *See Davis*, 485 F.3d at 1079.  Nor

25  are discovery limits.  *See Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 83 Cal. App. 4th 677,

26  689–90 (2000).  But as explained above, the confidentiality and discovery other provisions in

27  Tyler's agreement combine with others to give the company an unfair advantage.

1    In sum, Tyler has shown the delegation clause is both procedurally and substantive

2    unconscionable.  Therefore this court, not the arbitrator, must decide whether the broader

3    agreement is enforceable.

4    For the same reasons discussed above, the broader agreement is unconscionable as well.

5    *See Lim*, 8 F.4th at 1006 (affirming district court order "correctly concluded that the same bases

6    for concluding that the delegation clause was procedurally and substantively unconscionable . . .

7    also applied to render the broader arbitration clause unconscionable").  Tyler cites two additional

8    provisions that support that conclusion with respect to the broader agreement as well.

9    First, the arbitration agreement is more likely to impose delays on vulnerable employees

10   than the company.  If some claims in a given lawsuit are covered, but others are not, then the

11   agreement purports to "bifurcate and stay" the litigation of non-covered claims until the

12   arbitration concludes.  *See* Rodrigues Decl. Ex. 3 at 13.  While it would be a court, not the parties,

13   that decides whether a stay is appropriate, the company does not disagree that employees are

14   much more likely to have non-covered claims, such as sexual harassment claims.  This means the

15   bifurcate-and-stay provision is likely to fall more heavily on vulnerable, victimized employees.

16   *See* Opp'n at 15.  "This lack of mutuality is indicative of substantive unconscionability."

17   *Ramirez*, 16 Cal. 5th at 534.

18   Second, the company does not dispute that the agreement requires employees to arbitrate a

19   greater variety of claims against a greater number of respondents than the company.  *See* Opp'n at

20   10–11; Reply at 7–8.  The arbitration agreement is in fact shockingly broad.  For example, by its

21   own terms, it purports to require arbitration of all claims, including torts and contract claims, that

22   any one employee might have against another, regardless of the date those claims accrued, no

23   matter whether the responding employee was acting within the scope of the employment, and

24   even if the claim did not arise out of or relate to the employment.  *See* Rodrigues Decl. Ex. C at

25   11.  ("This Agreement . . . applies to *any* legal claims . . . that I may have . . . against the

26   Company's . . . employees . . . in their capacity as such *or otherwise*, including *but not limited to*

27   claims arising out of or related to my employment . . . .  These claims may include, *but are not*

28   *limited to*, . . . tort claims . . . ." (emphasis added)).  This is not to say Tyler's case or claims are at

13

1  the extreme fringes of this definition.  But the breadth of these terms is simply further

2  confirmation that, in general and at the time of signing, the agreement's burdens fell more heavily

3  on employees than on the company.  Under California law, "an unconscionability assessment

4  focuses on circumstances known at the time the agreement was made," not "subsequent

5  developments."  *Ramirez*, 16 Cal. 5th at 505–06.

6         Unconscionable terms can sometimes be "severed" from an agreement to allow the

7  remaining agreement to be enforced.  *See id.* at 513 (citing Cal. Civ. Code § 1670.5(a)).  Here, the

8  company does not ask the court to sever the unconscionable terms from the arbitration agreement

9  and enforce the remainder.  Nor does it refute Tyler's claim that the agreement is "permeated" by

10  unconscionable terms.  Opp'n at 1, 10.  The court is disinclined to consider severance on its own

11  initiative, but the circumstances of this agreement show severance would not be appropriate in

12  any event.  Severance is a matter of discretion.  *See Ramirez*, 16 Cal. 5th at 513.  "If the

13  unconscionability cannot be cured by extirpating or limiting the offending provisions, but instead

14  requires augmentation to cure the unconscionability, then the court should refuse to enforce the

15  contract."  *Id.* at 516.  "Even if a contract *can* be cured, the court should also ask whether the

16  unconscionability *should* be cured through severance or restriction because the interests of justice

17  would be furthered by such actions."  *Id.* (emphases in original).  It is not clear whether or how

18  this court could sever the provisions discussed above from the balance of the arbitration

19  agreement, nor whether such an effort would be equitable.  The court therefore exercises its

20  discretion not to enforce the arbitration agreement.

21  **III.   STAY**

22         As summarized above, in the alternative to an order enforcing the arbitration agreement, at

23  the time it filed its motion in May 2024, the company asked the court to stay this action while two

24  other similar cases were pending.[3]  *See* Mem. at 16–18.  The first is *Ramirez*, filed in December

---

[3] Tyler also is pursuing a parallel action in state court under the California Private Attorneys General Act.  *See generally* Compl., *Tyler v. Tailored Shared Servs., LLC*, No. 24CV082392 (Cal. Super. Ct. Alameda Cnty. July 5, 2024).  The court grants Tyler's request for judicial notice of the filings in that action and their contents, but not that the allegations nor claims within them are true.  *See* Pl.'s RJN, ECF No. 14; *Rosales-Martinez*, 753 F.3d at 894.

1  2023 in state court, and the second is *Marshall*, filed in state court and removed to the federal

2  district court in the Central District of California in April 2024. *See generally* Req. J. Not., ECF

3  Nos. 12-4, 14-3.

4      After the parties completed their briefing on the pending motion the state court issued a

5  tentative order granting the defendant's motion to compel arbitration in the *Ramirez* action. *See*

6  *generally* Tentative Ruling, *Ramirez v. Tailored Shared Servs., LLC*, No. CIVSB2332636 (Cal.

7  Sup. Ct. San Bernadino Cnty. filed Sept. 11, 2024).[4]  As the state court summarized in that

8  tentative order, the plaintiff in *Ramirez* had advanced only one argument in opposition to

9  arbitration, i.e., "that pursuant to the terms of the Arbitration Agreement, the claims in [*Ramirez*]

10  are not covered." *Id.* at 2.  The state court disagreed and tentatively held the agreement covered

11  the plaintiff's claims. *See id.* at 3.  It later adopted its tentative ruling as final. *See* Minute Order,

12  *Ramirez v. Tailored Shared Servs., LLC*, No. CIVSB2332636 (Cal. Sup. Ct. San Bernadino Cnty.

13  filed Sept. 17, 2024).  That court thus granted the defense motion to compel arbitration and stayed

14  the plaintiff's non-individual claims under the Private Attorneys General Act.

15      Next, about two months later, the federal district court presiding over the *Marshall* action

16  granted the plaintiff's motion to remand that action to state court. *See* Order Granting Plaintiff's

17  Motion to Remand [11] and Denying Defendant's Motion to Compel Arbitration [12], *Marshall*

18  *v. Tailored Shared Servs., LLC*, No. 24-3446 (C.D. Cal. Nov. 6, 2024).[5]  It therefore denied the

19  company's motion to compel arbitration as moot. *See id.*  As of the date this order is issuing, the

20  state court has not taken up the arbitration issue on remand.

21      In this case, the company relies primarily on the "first-to-file" rule in its request for a stay.

22  *See* Mem. at 16.  "The first-to-file rule allows a district court to stay proceedings if a similar case

23  with substantially similar issues and parties was previously filed in another district court." *Kohn*

---

Defendant does not request a stay of this action based on Tyler's parallel action in state court, and the court will not consider that possibility on its own motion.

[4] A copy of the state court's tentative ruling was filed on the docket of this action at ECF No. 20.  The court grants the request for judicial notice of the tentative ruling and the later minute order finally adopting the tentative ruling. *See supra* note 2.

[5] A copy of the district court's decision is available on the docket of this action at ECF No. 25.  The court grants the request for judicial notice of that order. *See supra* note 2.

1    *L. Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1239 (9th Cir. 2015).  The first-

2    to-file rule does not permit a federal district court to issue a stay based on a case pending in a

3    state court.  *See Tinnin v. Sutter Valley Med. Found.*, 647 F. Supp. 3d 864, 871–72 (E.D. Cal.

4    2022).  "[T]he Supreme Court has been clear that the *Colorado River* abstention doctrine, rather

5    than the first-to-file rule, governs a federal court's decision whether to defer to a state court and

6    abstain from exercising jurisdiction and that abstention under *Colorado River* should be much

7    rarer than abstention under the first-to-file rule." *Id.* at 872 (quoting *Wells Fargo Bank, N.A. v.*

8    *Zadourian*, No. 20-7512, 2021 WL 8945108, at *1 (C.D. Cal. Feb. 10, 2021) and citing *Colorado*

9    *River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)).  The court accordingly

10   considers a stay under *Colorado River*, not the first-to-file rule.

11          Under *Colorado River*, the general rule is that "the pendency of an action in the state court

12   is no bar to proceedings concerning the same matter in the Federal court having jurisdiction."

13   *Ernest Bock, LLC v. Steelman*, 76 F.4th 827, 835 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 554

14   (2024) (quoting *Colorado River*, 424 U.S. at 817).  "[A] stay of federal litigation in favor of state

15   court proceedings 'is the exception, not the rule.'" *Id.* (quoting *Colorado River*, 424 U.S. at 813).

16   Courts weigh eight factors when deciding whether a stay is appropriate:

17                  (1) which court first assumed jurisdiction over any property at stake;
18                  (2) the inconvenience of the federal forum; (3) the desire to avoid
19                  piecemeal litigation; (4) the order in which the forums obtained
20                  jurisdiction; (5) whether federal law or state law provides the rule of
21                  decision on the merits; (6) whether the state court proceedings can
22                  adequately protect the rights of the federal litigants; (7) the desire to
23                  avoid forum shopping; and (8) whether the state court proceedings
24                  will resolve all issues before the federal court.

25   *Id.* (quoting *R.R. Street & Co., Inc. v. Transport Ins. Co.*, 656 F.3d 966, 978–79 (9th Cir. 2011)).

26   If it is unclear whether one of these factors would weigh for or against a stay, the court must

27   assume it weighs against a stay.  *See id.* at 837.  Federal courts have a "virtually unflagging

28   obligation" to exercise the jurisdiction granted to them.  *Colorado River*, 424 U.S. at 817.

29          In this case, five of these factors weigh against a stay: there is no "property at stake";

30   nothing in the record suggests this district would be an inconvenient forum for either party;

1    Tyler's rights would not be protected in the state court proceedings in *Marshall* and *Ramirez*,

2    which concern the claims and rights of different plaintiffs; the record does not suggest any danger

3    of forum shopping; and *Marshall* and *Ramirez* would not necessarily resolve "all issues" before

4    this court, as the preclusive effect of any decisions in those cases is unclear at best.  The

5    remaining three factors could weigh in favor of a stay, but not strongly: if both state court actions

6    and this action move forward at the same time, the company but not Tyler will litigate all three

7    piecemeal; the two state court actions were filed before this action, but not long before this action;

8    and all three cases involve questions of state law, not federal law, but the relevant state law is

9    neither novel nor uncertain.

10          The company also asks this court to exercise its inherent authority to stay this action.  *See*

11   Mem. at 17–18.  It relies on cases in which federal district courts have exercised their authority to

12   manage their dockets under *Landis v. North American Co.*, 299 U.S. 248 (1936).  *See* Mem. at 17

13   (citing *Tungjunyatham v. Johanns*, No. 06-cv-01764, 2010 U.S. Dist. LEXIS 53825, at *7–8

14   (E.D. Cal. Apr. 30, 2010)).  "A docket management stay [under *Landis*] may not issue in favor of

15   parallel state proceedings if the *Colorado River* factors do not support a stay."  *Ernest Bock*, 76

16   F.4th at 843.  The court therefore denies the company's alternative request for a stay.

17   **IV.    CONCLUSION**

18          The court **denies** the motion to compel arbitration and alternative request for a stay.

19          This order resolves ECF No. 12.

20          IT IS SO ORDERED.

21   DATED:  November 26, 2024.

_____
SENIOR UNITED STATES DISTRICT JUDGE